SAM O. CAIN, J. M. PILGRIM, AND J. H. HANKINS *v.* STATE

No. 43590          May 24, 1965          175 So. 2d 638

*Barnett, Montgomery, McClintock & Cunningham,*
Jackson, for appellants.

*G. Garland Lyell, Jr., Asst. Atty. Gen.,* Jackson, for appellee.

ETHRIDGE, P. J.

Appellants, Cain, Pilgrim and Hankins, were convicted in the Circuit Court of Hinds County, First District, of malicious mischief. The pertinent statute, Mississippi Code Annotated section 2281 (1964 Supp.), provides:

Every person who shall maliciously or mischievously destroy, disfigure, or injure, or cause to be destroyed, disfigured, or injured, any property of another, either real or personal, shall be guilty of malicious mischief and, upon conviction thereof, shall be fined in a sum two-fold the value of the property destroyed or of the damage done, or be imprisoned not exceeding twelve (12) months in the county jail. Provided, further, if said damage be caused by a minor, said minor shall be presumed to be the agent of his parents or parent or persons having the care, custody and control of said minor, and said parents or parent or persons having the care, custody and control of said minor shall be civilly liable up to Three Hundred Dollars ($300.00) for said damage.

Provided, however, the foregoing limitation shall not be construed to be applicable in cases where any minor is shown to be the agent of his parent or parents or persons having the care, custody and control of any such minor.

■■ ■ The trial court correctly overruled defendants' demurrer to the indictment for failure to specify the value of the property destroyed or the monetary amount of the damage. Funderburk v. State, 75 Miss. 20, 21 So. 658 (1897), held that an indictment under the same statute was not bad for failure to charge the value of the property or the quantum of damages done. The act has a two-fold aspect, destruction or injury of property, and also its disfiguration. *Funderburk* is controlling, and we see no logical reason for overruling it.

## I.

Appellants were charged with willfully, unlawfully and maliciously hurling and propelling a steel ball with great force and striking and injuring the dwelling house owned and occupied by O. Marshall Sanford and wife, Ella K. Sanford, situated at 701 Glenmont Street in the City of Jackson, with the intent willfully, unlawfully and maliciously to injure and damage the property, contrary to the statute. The evidence is ample to support the conviction.

The appellants and Sanford were employees of Vickers, Inc., a manufacturing concern, and were members of the representative labor union at that plant. The union went on strike on January 28, 1964, and the strike ended April 27, 1964. Sanford went on strike with his union on January 28, but he returned to work on March 5. The three appellants stayed out until the matter was settled in April. Before Sanford returned to work, Hankins and three other union members came to his house in the daytime on Friday, February 21, because they heard he was thinking about going back to work. On that occasion Hankins told him that if he did return to the plant, Hankins would have to call him names and "keep after him" until either he whipped Sanford or Sanford whipped him. Sanford told the men he would not return until the following Tuesday, waiting to see how negotiations developed.

■■ ■ Counsel for Cain and Pilgrim objected to the testimony as what transpired between Hankins and Sanford, since their clients were not present. The circuit court sustained in part that objection, stating that this evidence would not be applicable to the other two defendants, but "applicable, if at all, to defendant Hankins." He overruled the objection to that extent, limiting the purpose of its admissibility. This evidence was admissible on that restricted basis. Wharton's Criminal Evidence § 417 (12th ed. by Anderson, 1955).

On March 5 Sanford returned to work, crossing the picket line. On the night of March 18 someone threw a pipe T through the window in Sanford's living room. On March 31 someone shot two ball bearings, about the size of a marble, through Sanford's window. On April 3 someone shot two more balls through the window in the front of his house. On all occasions Sanford was at home, with his wife and two small children. He reported these incidents to the police department, but they were unable to ascertain the culprits, unless he obtained a license tag number or some other identification.

Sanford began sitting up every night looking out his window and waiting for another incident. The previous ones occurred between 10 to 11 p.m. On the fourth night, Tuesday, April 7, Sanford was looking out his living room window. Around 10:50 p.m. it was quiet, and no other traffic had been passing recently. He saw the headlights of a car approaching from a street near the corner on which his house was situated, the car turned on Glenmont, and as it did, he heard "a twang of a rubber band of some sort, what I would classify as a sling shot, rubber poping from a sling shot. I heard it, and then I heard something strike my house." When that occurred, Sanford was outside, and fired his shotgun twice at the car. It was a light blue 1960 Ford, which he identified as Pilgrim's car. He stated it was

a two-door sedan; it later developed Pilgrim's car was a four-door sedan, but there is no dispute as to the identity of Pilgrim's car.

There was a street light, the weather was clear, and he was able to see the car, but not the identity of its three occupants. Sanford got in his car and tried to pursue the other vehicle, but it got away. When it became daylight, he saw the indentation made by another one of the round metal balls in the wood frame of his living room window, similar to the other balls previously thrown into his house. Mrs. Sanford was in the living room. She also said the car was a light blue Ford, heard the impact of the metal pellet, and saw it the next morning on the ground below the window. Sanford promptly reported this incident, and the police began searching for Pilgrim and his car.

It is undisputed that Cain, Pilgrim and Hankins were the occupants of the automobile in question, and that Sanford's two gunshots hit the car, injuring Pilgrim, who was driving, and Cain. One of the buckshot grazed the back of Pilgrim's neck, "burning" it. Two or three of the shot penetrated Cain's right arm, one passing all the way through it. Pilgrim accelerated his car after the second shot, and, the jury could find, he drove an out-of-the-way route to get away. Pilgrim dropped Hankins off at a restaurant on Highway 49 in northwest Jackson. He then drove his uncle, Cain, a distance of about 120 miles to Kosciusko, going a circuitous route by Yazoo City. In Kosciusko, where Cain had been living up to about three years before, he went to a doctor who removed the shot, bandaged it, and the next morning made x-rays. That night he and Cain stayed at the home of Cain's sister in Ethel, about seven miles from Kosciusko. The next morning Cain and Pilgrim returned to Jackson with Mrs. Cain. They left the car in Ethel. Cain had his arm checked by an orthopedist in Jackson, and went to the union attorney, who brought all three men

to the Jackson police headquarters. Although Cain had been living in Jackson several years, he said the reason he went to Kosciusko to have a doctor check his arm was not to evade detection, but to see his family physician.

Appellants denied that they threw or shot the metal ball against Sanford's house on April 7. They admitted they were in the car in question. There were no other vehicles or people in the vicinity at the time. The jury was justified in concluding that the metal ball must have been shot by one of the appellants from Pilgrim's car; and that these three men were aiding and abetting one another and were acting in concert.

Appellants' version was that they were riding around that night looking for the home of another union member, R. L. Myers, who worked at Vickers, Inc. They wanted to talk to him because he was becoming weak on the strike. They had Myers' street address, and in wandering around looking for his house, they said that they passed by Sanford's residence, where he shot at them. There was evidence which would justify the jury in thinking that one of appellants had been to Myers' home before and knew where it was; that Cain was sitting in the right front seat of the car at the time; and the right front window was down.

In short, there is no dispute that on the night of April 7, when the car occupied by the three appellants was passing Sanford's residence, someone threw or propelled a metal ball against the wood sill of the window on Sanford's home, making an indentation therein. There was no other traffic on the street at that time, and no one else except the three appellants. Sanford heard, before the ball hit his house, a sound as if it was shot from a rubber band, and this sound came from the car occupied by appellants. He then shot at it twice. Appellants fled, and tried to conceal the incident. Sanford had not stayed on strike, and he had been harrassed by some unknown persons on three previous occasions. They had damaged

his house, and he was looking for another incident, when the metal ball was shot against his house. Hankins previously had threatened Sanford if he went back to work before the strike was over. All three appellants were active union members, remaining on strike until it ended.

██ ██ Under these circumstances the jury were warranted in finding that, irrespective of which one of the three appellants actually threw or propelled the metal ball against Sanford's house, one of them did, and they were acting in concert and aiding and abetting one another; and that they did this maliciously and with an intent to damage Sanford's home and harrass him because he had gone back to work and crossed the picket line. Appellants were present, they had the motive, and the only issue of fact was whether one of them shot or propelled the metal ball.

## II.

The State obtained only one instruction defining the offense charged, and there was no error in it. It provided that if the jury believed beyond a reasonable doubt that one of the three defendants shot or propelled a steel ball out of an automobile in which they were riding, then it was not necessary for the State to prove which of them actually did the shooting or propelling of the steel ball against the Sanford house, and that all three defendants were equally guilty if the jury believed from the evidence beyond a reasonable doubt that each of the three defendants was present and aiding, abetting and assisting each other, when one of them maliciously shot or propelled the ball against the house, striking it, and that they intended such action to disfigure or injure the house.

██ ██ Appellants argue that the State's case is based purely on circumstantial evidence, and hence the evidence must be not only beyond a reasonable doubt but also

to the exclusion of every other reasonable hypothesis than guilt. However, this case is not based exclusively on circumstantial evidence. Sanford saw the car, identified it as belonging to Pilgrim, heard the noise made by a sling shot, heard the missile hit the house, and he retrieved it. Appellants admit it was their car. This is direct evidence, and the State was obligated to prove its case beyond a reasonable doubt, not under the criteria of exclusively circumstantial evidence. Moreover, appellants' own instructions submitted the issues to the jury on the basis of the State proving its case beyond a reasonable doubt.

## III.

There were no reversible errors in the evidence. One point made by appellants pertains to an oral statement made by one of the co-defendants (Hankins) to Detective Emmons, in the absence of the other two co-defendants. Prior to that, Detective Sanders was testifying about a statement made to him by Pilgrim, in the absence of the other co-defendants, and they objected on the ground it was not made in their presence. The court overruled the objection, holding that Pilgrim's statement to Sanders was applicable only to him, since the other two were not present, and "it would not affect them. So I so instruct you." Later the court overruled the objection to Detective Emmons' testimony about Hankins' statement "for the same reason that I made my ruling some time ago." In other words, in both instances the court limited the applicability of the statement made by the declarant to him only.

██ ██ This is in accord with the general rule. Where codefendants are tried together, including the declarant, the evidence is admissible against one and not the other. ██ ██ The recognized practice is to admit the declaration as against the declarant, but the court should state to the jury that the declaration is not admissible against

the other defendants, and is not to be considered in determining their guilt. 2 Wharton's *Criminal Evidence* § 417 (12th ed. by Anderson, 1955) ; 22A C. J. S., *Criminal Law* § 782 (1961) ; Underhill's *Criminal Evidence* § 776 (4th ed. by Niblack, 1935). This rule was recognized and applied in Millette v. State, 167 Miss. 172, 183, 148 So. 788, 791 (1933) ; see Grantham v. State, 167 Miss. 221, 149 So. 798 (1933).

██ ██ In the present case, the court's overruling of the objection to Detective Emmons' testimony about Hankins' statement, ''for the same reason that I made my ruling some time ago,'' manifestly referring to his previous explicit and adequate statement as to Detective Sanders, was not as clear and precise as it should have been, but on this record it was not error. Moreover, Hankins' statement to Detective Emmons was substantially in accord with the testimony of all three defendants. Cf. Millette v. State, *supra.*

Finally, appellants contend that it was error to permit Mrs. Sanford to testify over their objection regarding the three previous incidents of March 18 and 31 and April 3, in which other objects were thrown at their house. These were unrelated and separate acts committed by unknown persons, it is said. The trial court overruled the objection on the ground the evidence was admissible ''to show motive or same pattern.'' None of this evidence connected appellants directly with these prior occurrences.

██ ██ There was no error in the admission of this evidence. Without the evidence about the prior objects being thrown against Sanford's house, the entire background of the case would make no sense, and the jury would be in the dark as to why Sanford was on his front porch at night with a shotgun, watching for a car to come by and an object to be thrown at his house. The evidence was admissible to show a common pattern of action, whether or not appellants were involved in the

prior occurrences, to show motive of appellants, and to explain the otherwise dubious actions of the prosecuting witness Sanford. Furthermore, prior to the testimony of Mrs. Sanford, Mr. Sanford testified about the three prior incidents without any objection by defendants.

Affirmed.

*Gillespie, Jones, Brady and Smith, JJ.,* concur.